The CITY OF AURORA, Colorado, a
municipal corporation,
Petitioner–Appellant,

v.

The PUBLIC UTILITIES COMMISSION OF the STATE OF COLORADO and Edythe S. Miller, Andra Schmidt, and Ronald L. Lehr, Commissioners; Staff of the Colorado Public Utilities Commission; Centel Corporation; Southern Colorado Power; Public Service Company of Colorado; Colorado Rural Electric Association; Tri–State Generation and Transmission Association, Inc.; Intermountain Rural Electric Association; Home Builders Association; Empire Electric Association, Inc.; Union Oil Company of California; and Colorado Office of Consumer Counsel, Respondents–Appellees.

No. 88SA256.

Supreme Court of Colorado,
En Banc.

Jan. 29, 1990.

Kissinger & Lansing, P.C., Carl F. Lansing, Denver, for petitioner-appellant.

Kelly, Stansfield & O'Donnell, James K. Tarpey, Kevin W. Hecht and Charles L. West, Denver, for respondent-appellee Public Service Co. of Colorado.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., and Carol Smith Rising, Asst. Atty. Gen., Denver, for respondent-appellee, Colorado Public Utilities Com'n.

Chief Justice QUINN delivered the Opinion of the Court.

The City of Aurora appeals from a judgment of the district court affirming the Public Utilities Commission's adoption of a rule establishing a "gross embedded investment" methodology for calculating a utility construction allowance applicable to the service extension facilities for new electric utility customers.[1] The district court held that the Public Utility Commission regularly pursued its authority in adopting the rule, that its decision was just and reasonable and in accord with the evidence, and

that the new rule would not require the city to make a donation to a public utility corporation in violation of article XI, section 2 of the Colorado Constitution. We affirm the judgment of the district court.

I.

On March 19, 1985, the Public Utilities Commission (PUC) instituted a rule-making proceeding on proposed changes to Rule 31 of the Rules Regulating the Service of Electric Utilities in the State of Colorado. See 4 CCR 723-3, at 13-14 (1977). The PUC proposed to replace the existing Rule 31 (also referred to as the old rule), which utilized a "revenue based" method in calculating a free construction allowance for service connections and distribution line extensions to new customers, with a new Rule 31 utilizing a gross embedded investment methodology for calculating the utility construction allowance for new electric utility customers. The new rule contained the following declaration of purpose: "(1) to set forth the service connection and distribution line extension requirements to be observed by utilities offering electric service; (2) to protect each utility against making unwarranted or uneconomical investment which might react adversely through rates or service upon existing customers; (3) to recognize clearly the relationship between rates and investment and remove the previous promotional nature of the revenue guarantee methodology; and (4) to provide for the classification of electric distribution service and the appropriate terms and conditions under which service would be extended to same."

The old rule and the new rule establish different methods for calculating the utility construction allowance for service connection facilities, such as distribution extensions and service laterals. A distribution line is the common electric line, which may be either overhead or underground, used to supply electricity to customers.[2] A service

---

1. Appellate review of a district court decision affirming, setting aside, or modifying any decision of the Public Utilities Commission lies in this court. § 40-6-115(5), 17 C.R.S. (1984).

2. The new rule defines a "distribution system" and "distribution extension" as follows:
   *Distribution System* The utility's electric system including primary and secondary distribution lines, transformers, service laterals,

lateral, or service connection, consists of the overhead or underground electric circuit between the utility's distribution line and the point of delivery to the customer.[3]

Under the old rule, the utility construction allowance was calculated by multiplying the estimated monthly or annual gross revenue by a figure representing the ratio between the utility's investment in making the extension and the utility's assured revenue. The electric utility was required to pay the cost of service extension facilities in that amount and the new customer was then charged for any excess cost. In the case of Public Service Company customers, for example, the utility construction allowance was the product of the annual revenue multiplied by 5.5. *See Home Builders Assoc. v. Public Utility Commission*, 720 P.2d 552 (Colo.1986).[4]

The new Rule 31 substitutes a gross embedded investment methodology for the revenue based methodology. Under the gross embedded investment methodology, the utility construction allowance is based on the estimated average cost per existing customer expended by the electric utility for distribution extension facilities in the particular category or class of service provided. The new rule requires the electric

utility to pay an amount equal to the utility's systemwide average cost per customer for providing the particular class of service requested, with any excess cost being the responsibility of the new customer.

The new rule is divided into the following nine sections: Section I—General; Section II—Permanent Service; Section III—Indeterminate Service; Section IV—Temporary Service; Section V—Calculation and Payments of Refunds; Section VI—Three-Phase Consideration; Section VII—Distribution System Reinforcements; Section VIII—Overhead to Underground Conversion; and Section IX—Meter Installations. Section I states, in pertinent part, that "[i]n those instances in which permanent service is requested and the estimated cost of construction is greater than the gross embedded distribution plant investment per customer, the normal rates and charges will be inadequate to assure the recovery of all costs and to provide a fair return." Permanent service, which is covered in section II, refers to "overhead or underground electric line extensions for secondary or primary service to customers where the use of service is to be permanent and where a continuous return to the utility of sufficient revenue to support the necessary investment is assured."

and all appurtenant facilities provided by the utility (excepting meters) located on public highways and private rights of way, used for the purpose of general distribution of electric energy to its customers.

*Distribution Extension* Any construction of distribution facilities including primary and secondary distribution lines, transformers, service laterals and all appurtenant facilities including meter installation facilities to the extent provided by the utility (except meters) necessary to supply service to additional customers.

3. A "service lateral," as defined in the new rule, is "[t]he secondary overhead or underground electric circuit and associated facilities located between utility's distribution line and the point of delivery to customer. Service lateral provides service for customer's exclusive use."

4. In *Home Builders*, the PUC previously attempted to adopt the gross embedded investment methodology by amending the old rule in the course of an adjudicative proceeding involving an application filed by Public Service Company of Colorado to change the utility construction

allowance applicable to its new electric utility customers. We held that the attempted change was invalid because the PUC failed to comply with the procedural requirements applicable to a rulemaking proceeding. In contrast, the PUC in the instant case commenced a rulemaking proceeding, and the rule at issue was adopted by the PUC in the course of that proceeding.

Section II(c) of the old rule provided as follows with respect to the utility construction allowance applicable to service extension facilities for new service customers:

Each extension policy [for permanent service] shall specifically set forth the relation that the investment the utility is justified in making for an extension bears to the said assured monthly or annual revenue. This relation shall be expressed as the extension percentage of said revenue to said investment, or as the extension ratio of said investment to said revenue; in urban territory this relation may be limited by a fixed minimum amount of construction to be provided by the utility. The utility may adopt separate ratios of investment to revenue for different territories and conditions of service.

*Home Builders*, 720 P.2d at 554.

Section II contains the following requirements for extension service facilities for permanent service to new customers requesting such service:

Every electric public utility, operating under the jurisdiction of this Commission, shall own, build, or cause to be built to its established construction standards, operate and maintain every extension of its distribution system for · permanent service.

Extensions of a utility's distribution system upon public highways or rights-of-way acceptable to the utility, shall be built within a reasonable period after request for permanent service by bona fide applicant,[5] subject to the following conditions:

(a) For electric service of a permanent character, the utility will install at its expense, necessary overhead or underground electric distribution extension facilities equivalent in cost to the applicant's appropriate utility construction allowance. The utility construction allowances are to be derived for each of the various categories or classes of service provided.

i) The appropriate utility construction allowance for categories or classes of service who are metered by a kilowatt hour (KWH) meter only (without provision for measuring the demand) shall be equivalent to the gross embedded distribution plant investment per customer in the category or class of service as determined in the utility's cost-of-service analysis and approved by the Commission in the utility's last general rate case.

ii) The appropriate utility construction allowance for categories or classes of service who are metered by a meter capable of measuring kilowatt hour consumption and demands for power during periods less than the billing period shall be calculated in this way:

disaggregate the gross embedded distribution plant investment into customer-related plant and demand-related plant, as determined in the utility's cost of service analysis and approved by the Commission in the utility's last general rate case.

The customer portion of the utility construction allowance shall be derived as the gross, embedded, customer-related, distribution-plant investment per customer.

The gross, embedded, demand-related distribution plant investment shall be derived on the per kilowatt (KW) demand (at the individual meter basis).

The demand utility construction allowance shall be the product of the utility's estimate of the demand times the derived, gross, embedded demand-investment per KW.

The appropriate utility construction allowance for the demand-metered customer shall then be the sum of the customer portion of the utility construction allowance plus the demand portion of the utility construction allowance.

iii) The gross embedded distribution system plant investment in i) and ii) above shall be the utility's per book investment in its distribution system, exclusive of its investment related to meters and distribution substation investment.

Section I(k) of the new rule also states that the ownership of any pole line, circuit, or other facility provided wholly or in part at the expense of a new customer requesting service shall be vested exclusively in the electric utility.

The City of Aurora (Aurora), as a utility customer and an applicant for electric extension facilities, intervened in the rulemaking proceeding, as did other parties.[6]

---

5. A "bona fide applicant" is defined in the new rule as "[a] customer requesting service who has met all requirements of this rule and has made payment of or otherwise made arrangements for the construction payment to the utility."

6. In addition to Aurora, the following parties intervened in the rulemaking proceeding, or filed comments or suggestions with respect to the proposed rule: Centel Corporation; Southern Colorado Power; Public Service Company of Colorado; Colorado Rural Electric Association; Tri–State Generation and Transmission

On June 6, 1985, the hearings examiner conducted a hearing on the proposed rule and the parties were allowed to submit evidence and comments on the rule. The only witness testifying at the hearing was Ron L. Wendling, an engineering analyst employed by the PUC. Wendling testified that the revision of the old rule was necessary to promote economic fairness and to remedy several problems that arose under the old rule. One problem was that the revenue based methodology for determining the amount of a utility construction allowance had the potential for encouraging new customers to commit themselves to use higher levels of energy than necessary in order to obtain the benefit of a greater utility construction allowance. A new electric utility customer, for example, might install several hot water heaters and refrigerators in order to inflate the annual gross revenue from the estimated electrical usage and thereby receive a larger utility construction allowance. Another problem, according to Wendling, was that the revenue based methodology encouraged a customer to consume energy up to a minimum monthly level for which the customer had contracted regardless of the customer's actual needs.

Aurora objected to the proposed rule for several reasons, including the claim that it imposed an unfair economic burden upon new customers and did not provide for joint ownership of the extension facilities by both the electric utility and the new customer. The hearing examiner found that the new rule was necessary for the preservation of public health, safety, and welfare, and that it was in accord with the statutory procedures for rule-making set forth in the State Administrative Procedure Act, see

§§ 24-4-101 to -108, 10A C.R.S. (1988 & 1989 Supp.), and issued a recommended decision approving, with minor modifications, the adoption of the proposed rule. Aurora filed exceptions to the recommended decision, claiming that those provisions of the new rule vesting title to the new extension facilities in the electric utility violated article XI, section 2 of the Colorado Constitution by requiring the city to make a donation to a public utility company or corporation. On February 13, 1986, the PUC denied Aurora's exceptions and adopted the new rule. In its order, the PUC commented as follows on Aurora's argument with respect to ownership for the service extension facility:

> The City of Aurora mistakenly is of the opinion that in the event ownership of the line extension remains in the utility, but a municipality later decides to buy the utility, the utility would demand to be paid for the cost of the facility for which it has already been paid in accordance with the line extension rules. Aurora believes this would allow the utility to receive a double payment for the extension in the event of a purchase. In fact, contributions in aid of construction that are made by customers, and not provided from the utility's own capital funds, represent a reduction in the rate base of the utility involved. Since the rate base is reduced by the cost of facilities provided with ratepayer funds, rather than with the utility's own capital funds, in the event of a later purchase by a municipality, there would be no double payment since the amount of customer-provided funds will already have reduced the utility rate base and therefore, the asset value of the utility.[7]

---

Association, Inc.; Intermountain Rural Electric Association; Home Builders Association of Metropolitan Denver; Empire Electric Association, Inc.; Union Oil Company of California; and the Colorado Office of Consumer Counsel. The City of Aurora and Colorado–Ute Electric Association filed a joint petition for certiorari review in the district court. Only Aurora, however, has filed an appeal in this court, and only the Public Utilities Commission and the Public Service Company of Colorado have filed answer briefs.

7. In addition to its claim with respect to ownership of the service extension facilities, Aurora also contended that the gross embedded investment methodology would destroy urban growth and development. In rejecting Aurora's anti-growth argument, the PUC stated:

> The Commission would also point out that the gross embedded investment policy set forth in Rule 31 is not designed to either favor or discourage growth. Whether a particular community is in favor of or in opposition to growth belongs properly to the elected offi-

Aurora thereafter filed an application for a writ of certiorari or review in the district court, pursuant to the Public Utilities Law, § 40–6–115(1), 17 C.R.S. (1984), claiming that the PUC's adoption of the new rule was unjust, unreasonable, and unsupported by the evidence, and that the PUC did not regularly pursue its authority because the new rule violated the prohibition against a municipality's making a gift to a private corporation or company in violation of article XI, section 2 of the Colorado Constitution. In affirming the decision of the PUC, the district court concluded that there was sufficient basis in the record to support the adoption of the new rule and that the rule did not violate article XI, section 2 of the Colorado Constitution.

Aurora challenges the judgment of the district court on essentially two grounds. It argues that the district court, in reviewing the PUC's decision, did not make an independent analysis of the record in determining whether the PUC regularly pursued its authority in adopting the rule and that such independent analysis would have demonstrated that the record of the rule-making proceeding was insufficient to support the adoption of the rule. In addition, Aurora contends that the new rule requires a municipal electric utility customer to make a donation to a public utility corporation for a capital asset which the city will not own and thus violates article XI, section 2 of the Colorado Constitution.

## II.

We first consider Aurora's claim that the district court erred in not making an independent analysis of the record and that such an analysis would have demonstrated the insufficiency of the record to support the PUC's adoption of the new rule. We find Aurora's claim devoid of merit.

## A.

Section 40–6–115 of the Public Utilities Law sets forth the standards for a district court's review of a PUC decision. Subsection (1) of this statute states that "[n]o new or additional evidence may be introduced in the district court, but the cause shall be heard on the record of the commission as certified by it." Section 40–6–115(3) provides as follows:

The review shall not extend further than to determine whether the commission has regularly pursued its authority, including a determination of whether the decision under review violates any right of the petitioner under the constitution of the United States or of the state of Colorado, and whether the decision of the commission is just and reasonable and whether its conclusions are in accordance with the evidence.

We observed in *Home Builders* that since section 40–6–115(3) does not delineate the particular factors to be considered in a judicial review proceeding, the reviewing court should look to the State Administrative Procedure Act, §§ 24–4–101 to –108, 10A C.R.S. (1988 & 1989 Supp.), for specific guidelines. 720 P.2d at 559.

■ Because the PUC's role in a given case will dictate the particular statutory procedures required to be followed, the threshold question in a judicial review of a PUC decision is whether the PUC was acting in a rule-making or adjudicative capacity. *Id.* at 560. A rule-making proceeding is significantly different from an adjudicative proceeding, and the standards for judicial review will similarly be different. A rule-making proceeding is essentially quasi-legislative in character, in that it involves the promulgation of a regulation, often reflective of a policy judgment, relating to matters of a permanent or general character and not normally restricted to identifia-

cials of the community, and not this Commission. The Commission takes no position on this issue. The gross embedded investment policy adopted by the Commission is designed to do no more than to protect existing ratepayers from the burden of subsidizing the cost of new facilities for which they are not responsible. Cross-subsidization of cities with

expansion policies ... by cities with controlled growth philosophies must not be permitted by this Commission.... In other words, the gross embedded investment policy reflected in Rule 31 is no more than a reflection of the policy that the cost causer should be the cost payer.

ble persons or groups and usually prospective in nature. *See Cherry Hills Resort v. Cherry Hills Village,* 757 P.2d 622, 625 (Colo.1988). The statutory requirements for administrative rule-making are contained in section 24–4–103 of the State Administrative Procedure Act and include: notice to interested parties of the rule-making proceeding; an opportunity for interested parties to submit written data, views, or arguments on any proposed rule; and the requirement, as codified in subsection 24–4–103(4), that any rule promulgated by the agency be on the record, "which shall consist of proposed rules, evidence, exhibits, and other matters presented or considered, matters officially noticed, rulings on exceptions, any findings of fact and conclusions of law proposed by any party, and any written comments or briefs filed." [8] An adjudicative proceeding, in contrast to a rule-making proceeding, involves a "determination of the rights, duties, or obligations of specific individuals on the basis of the application of presently existing legal standards or policy considerations to past or present facts developed at a hearing conducted for the purpose of resolving the particular interests in question." *Cherry Hills Resort,* 757 P.2d at 615. Judicial review of an adjudicative proceeding, therefore, will often involve a record-specific inquiry into whether the administrative determination was based on "substantial evidence when the record is considered as a whole." § 24–4–106, 10A C.R.S. (1988).

▮ When an administrative agency adopts a rule based on a policy judgment, particularly within the expertise of the agency, and not involving controverted questions of critical fact, it is not incumbent on the agency to present evidence in support of the proposed rule. *Citizens for Free Enterprise v. Dept. of Revenue,* 649 P.2d 1054, 1063 (Colo.1982); *accord Regular Route Common Carrier Conference*

*v. Public Utilities Commission,* 761 P.2d 737, 743 (Colo.1988). As long as such a proposed rule is made part of the record and there is a rational basis for the agency's action, "the agency can choose to reject any adverse submissions and adopt the proposed rule." *Regular Route Common Carrier Conference,* 761 P.2d at 743. In other words, "the fact that the agency exercised its discretion in a manner contrary to that advocated by the objectors [does] not mean that the agency action was not 'based on the record.'" *Citizens for Free Enterprise,* 649 P.2d at 1063. Furthermore, a rule adopted pursuant to a statutory rule-making proceeding is presumed to be valid, and the burden is upon the challenging party to demonstrate "that the rule-making body acted in an unconstitutional manner, exceeded its statutory authority, or otherwise acted in a manner contrary to statutory requirements." *Regular Route Common Carrier Conference,* 761 P.2d at 743. Thus, while section 40–6–115(3) requires a district court in reviewing a PUC decision to "decide all relevant questions of law and interpret all relevant constitutional and statutory provisions," the court in doing so must be in accord with the principle that a rule adopted pursuant to a statutory rule-making proceeding is presumed to be valid and the burden is upon the party challenging the rule to demonstrate its invalidity.

### B.

▮ In the instant case, the district court did make an independent analysis of the record in determining whether the PUC regularly pursued its authority in adopting the new rule. After noting that Aurora was not claiming that the PUC failed to follow the statutory procedures for rule-making set forth in the State Administrative Procedure Act, the court then went on to remark as follows:

**8.** In addition, section 24–4–103(4)(b) states that no rule shall be adopted unless: (1) the record of the rule-making proceeding demonstrates the need for the regulation; (2) the proper statutory authority exists for the regulation; (3) to the extent practicable, the regulation is clearly and

simply stated so that its meaning will be understood by any party required to comply with the regulation; (4) the regulation does not conflict with other provisions of law; and (5) the duplication or overlapping of regulations is explained by the agency proposing the rule.

Here, the PUC, using its expertise in rule-making, has determined that this method of compensation [the gross embedded investment methodology] will result in a more equitable distribution of costs.

In new Rule 31, the Commission has made a determination pursuant to its quasi-legislative mandate that the method of financing new construction, which is just, reasonable, and equitable to facilities and municipalities [within] the State of Colorado, is arrived at by using the gross embedded cost methodology.

The Court finds the PUC heard evidence and weighed policies and legal considerations, and has performed [its] function in a proper manner.

■ We could resolve Aurora's claim concerning the standard of judicial review by simply holding that the new Rule 31 involves a matter of discretionary policy judgment within the expertise of the PUC and the invalidity of the rule has not been demonstrated. We need not resort to such a peremptory resolution of Aurora's claim, however, because the record as a whole refutes Aurora's argument regarding the standard of review. Two express purposes of the new rule are "to protect each utility against making unwarranted or uneconomical investment which might react adversely through rates or service upon existing customers" and "to recognize clearly the relationship between rates and investment and remove the previous promotional nature of the revenue guarantee methodology." There was testimony at the rule-making proceeding establishing that the old rule had the potential to cause a new customer to inflate energy uses in order to obtain a greater utility construction allowance. Furthermore, the PUC in its order denying Aurora's exceptions to the recommended decision noted that the gross embedded investment methodology reflected in the new rule was designed "to protect existing ratepayers from the burden of subsidizing the cost of new rate facilities for which they are not responsible." We have no hesitation, therefore, in concluding that the district court properly exercised its judicial review function in this case and that the record of the rule-making proceeding adequately supports the PUC's adoption of the new rule.

## III.

We turn now to consider Aurora's claim that the new rule, which uses the gross embedded investment methodology in calculating the utility construction allowance for new service facilities, violates article XI, section 2 of the Colorado Constitution by requiring a municipal corporation to make a donation to a public utility corporation in payment of a capital asset which the municipality will not own. We conclude for several reasons that the new rule does not suffer from such a constitutional infirmity.

■ We initially take note of the text of article XI, section 2. The constitutional language pertinent to this case prohibits any city from making "any donation" to any public or private company or corporation. The purpose of this provision is to prohibit a municipality from transferring public funds to a private company or corporation without receiving any consideration in return. The term "donation" obviously means a gift—that is, a voluntary transfer of property to another without consideration. *See General Telephone Co. of Northwest, Inc. v. City of Bothell*, 105 Wash.2d 579, 716 P.2d 879, 885 (1986); *Black's Law Dictionary* 619 (5th ed. 1979). It cannot be reasonably argued that Aurora, a new utility customer, would receive no consideration in return for the payment of some of the costs associated with service extension facilities. Aurora, as any other new utility customer, would receive electrical utility service which is, after all, exactly what a new customer bargains for. Aurora, therefore, clearly would receive consideration in return for its payment.

We next consider the issue of ownership. The new rule places ownership of the service extension facilities in the public utility and, in that sense, arguably confers a benefit on the utility over and above the utility's contributions to the cost of the facilities. The placement of ownership in the public utility, however, does not render the utility

customer's share of the cost of the facilities a "donation" for purposes of article XI, section 2 of the Colorado Constitution. The practical value of these facilities is their function as a conduit for the utility's delivery of electric utility service to the customer. Because it is the electric utility, not the customer, which bears the responsibility for servicing the facilities, placing ownership of the service extension facilities in the public utility serves the function of enhancing the utility's ability to carry out its responsibility of effectively delivering electric utility service to the customer. Aurora argues, nonetheless, that if at some point it were to attempt to purchase the service extension facilities from the public utility for the purpose of operating a municipally owned utility, it would be required to pay twice for the facilities—*i.e.*, the initial share of its costs for the facilities pursuant to Rule 31 and the final cost upon purchase. The PUC addressed this issue and concluded that "there would be no double payment since the amount of customer-provided funds will already have reduced the utility rate base and therefore, the asset value of the utility." Furthermore, section 40–5–105 of the Public Utilities Law expressly provides that the assets of any public utility may be sold other than in the normal course of business only upon authorization by the commission "and upon such terms and conditions as the commission may prescribe." Since the PUC would have the responsibility of approving any prospective sale or transfer of any public utility's assets outside the ordinary course of business, it necessarily would have the authority to determine whether some setoff might be appropriate.

▪ Finally, we draw substantial support for our decision from the public purpose doctrine. Our prior cases have held that article XI, section 2 of the Colorado Constitution does not prohibit a municipality from conferring a monetary benefit on a private company in consideration of the company's undertaking a project, even though the company might have been required to undertake the project without such benefit, as long as the expenditure by the municipality furthers a valid public pur-

pose. *E.g., Witcher v. Canon City,* 716 P.2d 445 (Colo.1986) (decision of Canon City to amend lease with private company responsible for operating Royal Gorge Bridge, pursuant to which city agreed to reduction of its share of bridge tolls collected by company and made other monetary considerations in order to allow company to recover portions of costs of renovating bridge, served a valid "purpose" and did not constitute "donation" under article XI, section 2, even though private company arguably was obliged to modernize bridge pursuant to other provisions of lease); *Lyman v. Town of Bow Mar,* 188 Colo. 216, 533 P.2d 1129 (1975) (municipal ordinance which established improvement district for burying overhead utility lines owned by Mountain States Telephone and Telegraph Company and Public Service Company of Colorado, and which also established assessments against district property to pay for conversion costs and provided for issuance of bonds to pay conversion costs, did not constitute a "donation" to a company in violation of Article XI, section 2). Other courts have relied on the public service doctrine in rejecting constitutional challenges to municipal actions resulting in some monetary profit to private companies under circumstances somewhat analogous to those present here. *See, e.g., State v. City of Austin,* 160 Tex. 348, 331 S.W.2d 737 (1960) (use of public funds for relocation of utility facilities necessitated by improvement of public highway not violative of constitutional prohibition against application of public funds for private purpose); *Wagner v. Salt Lake City,* 29 Utah 2d 42, 504 P.2d 1007 (1972) (ordinance authorizing burying of electric and telephone wires without cost to public utilities not unconstitutional since undergrounding enhances public safety); *General Telephone Company of Northwest,* 105 Wash.2d 579, 716 P.2d at 879 (1986) (charging municipality, which requested burying of aerial telephone facilities, the difference in cost between installation of aerial and underground facilities not violative of constitutional prohibition against making gift to municipality).

■ Although the term "public purpose" is not susceptible of precise definition and ultimately depends upon the facts and circumstances of the case, E. McQuillin, *Municipal Corporations*, § 39.30 (1985), we are satisfied in this case that the new Rule 31 serves several public purposes. The rule is calculated to conserve energy by eliminating excessive use occasioned by the preexisting revenue based methodology and, as stated in the prefatory paragraph to the rule, is also directed toward protecting each utility "against making unwarranted or uneconomical investment which might react adversely through rates or services upon existing customers." To be sure, the PUC might have chosen an alternative formula for cost allocation or even required the public utility to bear the full cost of the service extension facilities. The fact that the cost allocation incorporated into the new Rule 31 confers some benefit on a public utility, however, is not to say that this allocation does not serve a public purpose.

The judgment is accordingly affirmed.