QUESTION PRESENTED AND CONCLUSION
Question: May the Regents, consistent with the limitations contained in Art. XI, § 2 and Art. V, § 34 of the Colorado Constitution, lawfully authorize the transfer of certain assets, without consideration, from TUIC, a non-profit corporation, to CUREF, another non-profit corporation, both of which are organized for the benefit of the University of Colorado?
Conclusion: Yes. The Regents may satisfy these constitutional provisions if it finds that the transfer of funds and assets from TUIC to CUREF satisfies a legitimate public purpose.
DISCUSSION
Background
The first corporation involved in this opinion, the University Improvement Corporation or "TUIC," was organized in 1976 to "acquire, improve, operate, and maintain real and personal property for the ultimate benefit of the University of Colorado. . . ." Restated Articles of Incorporation of the University Improvement Corporation, Art. III, § 1. The mission of TUIC is to support the University by generating cash flow and by providing real estate expertise and long range planning. TUIC is a 501(c)(3) organization under the Internal Revenue Code. The money generated by TUIC is used to support various University capital improvement projects and programs. The TUIC Board of Directors consists of four Regents and five non-regent directors appointed by TUIC and confirmed by the Board of Regents. TUIC is considered a "University related party," and its financial statements are therefore consolidated into the University's financial statements. Under criteria established in Colorado caselaw, TUIC is a public entity.
TUIC holds title to several real estate parcels that were conveyed to TUIC by the University. It also holds approximately $7,800,000 in cash and investments resulting from real estate transactions involving properties conveyed to TUIC by the University.
The second corporation, the Colorado University Real Estate Foundation or "CUREF," was incorporated by private individuals as a Colorado nonprofit corporation on August 12, 2002. According to its Articles of Incorporation, CUREF was organized exclusively for the benefit of, to perform the functions of, and to carry out the purposes of the University of Colorado. Upon dissolution, all of CUREF's assets are to be distributed to the University. CUREF's affairs are conducted by a Board of Directors consisting of nine voting members. Of these, four are appointed by the University, and only one of those four may be a member of the Board of Regents. No members may be University employees or agents. CUREF is a section 501(c)(3) tax exempt organization and is also a University supporting organization under section 509(a)(3) of the Internal Revenue Code.
The backdrop for this opinion is the University's effort to develop a strategy to manage its nonacademic real estate assets. In the year 2000, the University asked the Urban Land Institute for assistance in this regard. The Institute's recommendations included the formation of a new entity with the ability to minimize a given project's time frame as well as to reduce the University's cost in nonacademic development. The Institute also recommended seeking out private partnerships for the development of projects.
In accord with these recommendations, the TUIC Board of Directors now proposes to transfer to CUREF all or a portion of its real estate and the cash and investments. CUREF would then manage these properties and other assets.
The reason for this transfer is important. As a public entity, TUIC is subject to various constitutional and statutory limitations. These include limits on pledging of credit in aid of private corporations, Colo. Const. Art. XI, § 1; becoming a joint owner with a private corporation, Colo. Const. Art. XI, § 2; TABOR debt limitations, Colo. Const. Art. X, § 20; and the prohibition on state competition with private entities, § 24-113-104, C.R.S. (2002). Because of these legal restrictions, TUIC cannot maximize its return on these properties by engaging in joint ventures or limited partnerships or by mortgaging the properties. In contrast, as a private entity CUREF can utilize a wider range of strategies for maximizing the return on assets held for the benefit of the University. CUREF is neither established by nor controlled by the University. A transfer to CUREF would also probably limit the University's ultimate exposure on any transaction to the value of the assets transferred.
This transfer requires the approval of the Board of Regents. The University is the beneficial owner of all of TUIC's properties, and TUIC is subject to the Regent's control. The Regents have therefore requested this opinion regarding the legality of the proposed transfer.
The legal question posed by the Regents is a narrow one, concerning whether this proposed transaction is lawful under two provisions of the Colorado Constitution. I conclude below that the transaction is legal if the Regents formally determine that it satisfies an identified public purpose.
Analysis
As a threshold matter, I must determine whether TUIC is a "public" entity under Colorado law. If TUIC is public, then this transfer would implicate Colorado's constitutional restrictions on donations or appropriations to private corporations. For the following reasons, I conclude that TUIC is a public entity.
In Colorado Ass'n of Public Employees et al. v. Board of Regents of the University of Colorado, et al., 804 P.2d 138 (Colo. 1990), the Colorado Supreme Court analyzed the relationship between the University and the University Hospital following a reorganization by the legislature to transform the Hospital into a private, nonprofit corporation. The Court held that University Hospital remained a state entity. In so holding, the Court set forth the test used to determine whether an entity created by the state or local governments is private or public. The Court stated that whether University Hospital may be considered private depended upon whether 1) it is founded and maintained by private individuals or a private corporation, and 2) whether the state is involved in the management or control of its property or internal operations. In addition, in order to be a private corporation the "ultimate control of the corporation must be vested in the members or the directors through their power to vote." Id. at p. 143.
Applying these factors, the Court held that the reorganized University Hospital could not be characterized as private. The Hospital had been created by the Regents, and the Regents had a continuing role in controlling the operation of the Hospital by virtue of their power to appoint and remove the Board of Directors, arrange for the billing, collection, and disbursement for professional services, and retained implied and actual control over the budget and spending of the Hospital.
I conclude that TUIC is a public entity under the University Hospital test. TUIC's Articles of Incorporation grant the Regents broad control over the selection and retention of TUIC's Board of Directors. In addition, TUIC's Articles of Incorporation grant the University the option to repurchase TUIC's real estate, and state that TUIC's business shall be conducted so that the corporation activities will be consistent with and supportive of the goals of the University as expressed by the Board of Regents. Accordingly, TUIC should be considered a public entity for purposes of the Art. XI, § 2 and Art. V, § 34 analysis.
TUIC is under no general statutory restriction on its ability to alienate real property. However, because TUIC is a public entity, the transfer in question is subject to two provisions of the Colorado Constitution affecting the ability of the state to transfer, donate, or otherwise convey its funds to a private entity.
The first constitutional restriction is Colo. Const. Art. XI, § 2. It prohibits the State from making donations to private corporations:
Neither the state, nor any county, city, town, or school district shall make any donation or grant to, or in aid of, or become a subscriber to, or shareholder in any corporation or company or a joint owner with any person, company, or corporation, public or private. . .
This provision is known as the "Anti-Donation Clause." Its purpose is to prohibit a state or local government from transferring public funds to a private company or corporation without receiving any consideration in return. City and County of Denver v. Qwest Corp., 18 P.3d 748, 758
(Colo. 2001); City of Aurora v. Public Utilities Com'n of State of Colo., 785 P.2d 1280, 1288 (Colo. 1990).
Transfers of TUIC's properties and holdings to CUREF would eventually result in a benefit to the Regents. The property in question was originally derived from gifts to the University — no state taxes or revenues were used to acquire them. The express purpose of such a transfer is to enable CUREF to encumber TUIC's real estate assets and enter into real estate joint ventures free of constitutional limitations, thereby allowing TUIC's real estate assets to generate profits to benefit the University's educational mission. As a University supporting organization under the Internal Revenue Code, 85 percent of CUREF's net income (excluding capital gains) must be distributed annually to the University. Furthermore, upon dissolution, all of CUREF's assets are to be distributed to the University. Because the University would receive a benefit for the transfer in the form of increased revenues to be used to support the University, the purpose of the Anti-Donation Clause is not offended. See City of Aurora v. Public Utilities Com'n of State of Colo., 785 P.2d at 1288 (receipt of electrical service deemed adequate consideration for rule requiring municipality to make a donation to a public utility corporation in payment for a capital asset which the municipality will not own).
Also, following a determination by the Regents, the proposed transfer falls squarely within the Public Purpose exception to the Anti-Donation Clause. Initially, courts strictly enforced this prohibition in aid to corporations, absent consideration. See The Colorado Central R.R. v. Lea, 5 Colo. 192 (1879). However, in subsequent holdings the Colorado Supreme Court has recognized a "public purpose" exception to the prohibition in Art. XI, § 2:
Our prior cases have held that article XI, section 2 of the Colorado Constitution does not prohibit a municipality from conferring a monetary benefit on a private company in consideration of the company's undertaking a project, even though the company might have been required to undertake the project without such benefit, as long as expenditure by a municipality furthers a valid public purpose.
City of Aurora v. Public Utilities Com'n of State of Colo.,785 P.2d at 1289. See Witcher v. Canon City, 716 P.2d 445 (Colo. 1986) (authorization of improvements to Royal Gorge Bridge served a valid public purpose of improving and extending life of valuable source of municipal revenue); Denver Urban Renewal Auth. v. Byrne, 618 P.2d 1374
(Colo. 1980) (strong public purpose served by urban renewal projects; fact that private interests are indirectly benefited does not render plan unconstitutional under Art. XI, § 2); Lyman v. Town of Bow Mar,188 Colo. 216, 533 P.2d 1129 (1975) (ordinance establishing improvement district for burying overhead utility lines owned by corporations, and providing for issuance of bonds to pay conversion costs, was not prohibited donation).
The term "public purpose" is not susceptible to precise definition and ultimately depends upon the facts and circumstances of the case. In City of Aurora v. Public Utilities Com'n of State of Colo., 785 P.2d at 1290, the Colorado Supreme Court has stated that the determination of what is a public purpose is for the relevant legislative body to make:
The test is whether the power, if exercised, will promote the general objects and purposes of the municipality, and of this the legislature is the judge in the first instance; and unless it clearly appears that some constitutional provision has been infringed, the law must be upheld.
Ginsberg v. City and County of Denver, 436 P.2d 685, 688 (Colo. 1968). Thus, "anything calculated to promote the education, the recreation or the pleasure of the public is to be included within the legitimate domain of public purposes." Id. at p. 689 (quoting with approval Meyer v. City of Cleveland, 35 Ohio App. 20, 171 N.E. 606). The modern trend is to expand and liberally construe the term "public purpose." Id. at 688.
I conclude that the Regents may legally find that the proposed conveyance falls under the public purpose exception to Art. XI, § 2. The purpose of the conveyance is to allow TUIC's assets to be put to more productive and lucrative use for the benefit of the educational mission of the University, promote higher education, create employment opportunities for the citizens of the State of Colorado, and generate revenues for the University. Enhancing governmental revenues and economic activity have been held to be valid purposes falling within the exception to Art. XI, § 2. See Witcher v. Canon City, 716 P.2d at 455; In re Interrogatory Propounded by Gov. Roy Romer on House Bill 91S-1005, 814 P.2d 875, 884
(Colo. 1991).
The second constitutional restriction at issue is Art. V, § 34 of the Colorado Constitution. It prohibits appropriations to corporations not under the absolute control of the State:
No appropriation shall be made for charitable, industrial, educational or benevolent purposes to any person, corporation or community not under the absolute control of the state, nor to any denomination or sectarian institution or association.
This provision is called the "Anti-Appropriation Clause."
A public purpose exception to the Anti-Appropriation Clause was recognized as early as 1940 in Bedford v. White, 106 P.2d 469, 476
(Colo. 1940), where the court held that a statute authorizing judicial pensions was a form of compensation for commendable service rendered to the public rather than a benefit to the individual recipient, and thus served a valid public purpose. The Colorado Supreme Court has stated that a public purpose with respect to the Anti-Appropriation Clause is not to be presumed from the mere passage of a legislative enactment. Rather, to come within the public purpose exception, "the legislature must evince a discrete and particularized public purpose which, when measured against the proscription of Art. V, § 34, preponderates over any individual interests incidentally served by the statutory program." In re Interrogatory Propounded by Gov. Roy Romer on House Bill 91S — 1005, 814 P.2d at 883 (quoting Americans United for Separation of Church and State Fund, Inc. v. State of Colorado, 648 P.2d 1072, 1086
(Colo. 1982)).
In this case, the Regents have not yet formally considered the proposed transfer in question, and have not yet articulated a "discrete and particularized public purpose" as required by Bedford and its progeny. However, at least three potential public purposes might be identified. First, the transfer is designed to result in increased revenues for the University.
Second, the revenues from the transfer will promote higher education and enrich the academic community. Finally, economic development of the properties involved might create employment opportunities for the citizens of the State of Colorado.
This office has previously found that the creation of jobs and stimulation of economic development by construction of a proposed baseball stadium in Denver is a "discrete and particularized" public purpose, removing a baseball stadium lease from the operation of the Anti-Appropriation Clause. Formal Opinion of Gale Norton, No. 92-1 (January 31, 1992). Moreover, the Colorado Supreme Court has held that economic development legislation enacted to attract a United Airlines Maintenance Facility to Colorado served the "discrete and particularized" public purpose of encouraging economic development and the development of the state's aviation system. In re Interrogatory Propounded by Gov. Roy Romer on House Bill 91S-1005, 814 P.2d 884. Finally, the Colorado Supreme Court has found a "particularized and discrete" public purpose in promotion of higher education in a statutory grant program authorizing appropriations for a scholarship program. Americans United for Separation of Church and State Fund, Inc. v. State of Colorado, 648 P.2d at 1086.
The determination of what constitutes a valid public purpose is, in the first instance, a legislative one. Thus, the final question is whether the Board of Regents is the appropriate public body to make that determination regarding the proposed transfer in question. I conclude that it is.
Under Colorado law, the determination of what constitutes a public purpose is not reserved exclusively for the General Assembly. Local governments, such as cities and counties, also have the authority to determine a public purpose for Anti-Donation and Non-Appropriation Clause purposes. See Witcher v. Canon City, 716 P.2d at 455; Ginsberg v. City and County of Denver, 436 P.2d at 688.
The Regents occupy a unique constitutional position in state government. The Colorado Constitution grants the Regents a significant measure of institutional autonomy, and the Colorado Supreme Court has held that laws of general application do not limit that authority unless expressly and unmistakably intended to do so. The Colorado Constitution establishes the Regents as a "body corporate," Colo. Const. Art. IX, § 12, and grants the Regents significant authority to govern the internal affairs of the University:
The governing boards of the state institutions of higher education, whether established by this constitution or by law, shall have the general supervision of their respective institutions and the exclusive control and direction of all funds of and appropriations to their respective institutions, unless otherwise provided by law.
Colo. Const. Art. VIII, § 5. Additionally, § 23-20-111, C.R.S. (2002) confers on the Regents "general supervision of the university and control and direction of all funds of and appropriations to the university. . . ." General power to govern the University is conferred upon the Regents by § 23-20-112, C.R.S. (2002), which states that "[t]he board of regents shall enact laws for the government of the university. . . ." Also, the Regents, as well as other governing boards of state institutions of higher education, are granted the authority to "promulgate rules and regulations for the safety and welfare of students, employees, and property. . . ." Colorado courts have held that the authority granted to the Regents by the Colorado Constitution and pursuant to state statute to govern the University and enact laws for University governance can only be nullified by a legislative enactment expressly aimed at doing so. Associated Students of University of Colorado v. Regents of University of Colorado, 543 P.2d 59 (Colo. 1975).
Thus, in interpreting the enactments of the Board of Regents, the courts have treated such enactments as statutes. See Buttney v. Smiley,281 F. Supp. 280, 284-285 (D.Colo. 1968) ("University authorities have an inherent general power to maintain order on campus and to exclude those who are detrimental to its well being."); Sigma Chi Fraternity v. Regents of the University of Colorado, 258 F. Supp. 515, 528 (D.Colo. 1966) (Board of Regents is a "body politic" which is distinct from the executive branch of government). The laws enacted by the Regents pursuant to this authority have been treated as statutes for the purpose of interpretation. Subryan v. Regents, 698 P.2d 1383, 1384 (Colo.App. 1984). Other states have also characterized the power granted to elected governing education boards as legislative or quasi-legislative in character. See Boothe Newspapers, Inc v. University of Michigan Bd. of Regents, 507 N.W.2d 422 (Mich. 1993); State Bd. of Education v. Honig,16 Cal.Rptr.2d 727 (Cal.App. 1993); Hodgkins v. Central School Dist. No. 1, 355 N.Y.S.2d 932 (N.Y.App.Div. 1974).
I have located no statute enacted by the General Assembly that limits the power of the Regents concerning this proposed transaction. Therefore, given the Regents' unique constitutional powers over the University, including exclusive control over the University's funds, and the court's treatment of the Regents' enactments regarding the University as legislative in character, I conclude that the Regents may choose to determine that the transfer of funds from TUIC to CUREF satisfies a public purpose.
Conclusion
If the Regents of the University of Colorado find that the proposed transfer of real estate and assets from TUIC to CUREF satisfies a public purpose, the transfer does not violate Art. XI, § 2 or Art. V, §34 of the Colorado Constitution.