The Honorable Ted Strickland President of the Senate State Capitol Building Denver, Colorado 80203 June 3, 1991
Dear Senator Strickland:
By your letter of May 15, 1991, you have requested a formal opinion concerning whether various requirements of the Colorado Constitution would be violated by proposed legislation which would provide tax incentives for United Airlines, Inc. ("United") to construct and operate a major aircraft maintenance facility in Colorado. Recent estimates are that the proposal submitted would grant United as much as $609 million in tax credits extending over a period of 30 years. Furthermore, local economic impact estimates have ranged from a projected net loss to the state of $117 million to a net positive impact of $173 million. Although intriguing, these loss/gain forecasts have played no part in my legal analysis. As Attorney General I have spent considerable time scrutinizing the relevant constitutional provisions, and the cases interpreting those sections. What follows is, therefore, my best analysis of the legal issues presented and the approach Colorado courts will take in construing such issues. Several significant issues are presented in your letter and by the draft legislation.
QUESTIONS PRESENTED AND CONCLUSIONS
1. Under the proposed legislation, would the state make a donation or grant to United contrary to the Anti-Donation Clause, art. XI, § 2 of the Colorado Constitution?
As this clause has been interpreted, no.
2. Does this legislative proposal make a private appropriation to United in violation of the Private Appropriation Clause, art. V, § 34 of the Colorado Constitution?
As this clause has been interpreted, no.
3. Under the proposal, does the General Assembly relinquish its power to tax corporations in violation of art. X, §§ 9 and 10 of the Colorado Constitution?
No.
4. Does the proposed tax incentive legislation deny equal protection of the laws, or amount to special legislation granting United a special or exclusive privilege in violation of the Special Legislation Clause, art. V, § 25 of the Colorado Constitution?
 Although the proposal raises serious constitutional concerns, it is probable that a court would uphold it.
5. Does the proposed legislation create an irrevocable grant of special privileges, franchises or immunities, in violation of art. II, § 11 of the Colorado Constitution?
Yes, although the case law is not conclusive.
6. Does the delegation of power to the Governor to negotiate an agreement that "may" provide for an income tax refund and to set the amount of that refund, not to exceed $2,000, constitute an unlawful delegation?
Yes, although this deficiency can be remedied.
7. If United is entitled by this legislation to receive annual cash payments for 30 years from future revenues otherwise available for general purposes, would that obligation be an unconstitutional debt prohibited by art. XI, § 3?
Yes.
ANALYSIS
I. INTRODUCTION
The Colorado General Assembly will meet in special session beginning June 4, 1991, to consider the Governor's call for legislation to provide incentives for United to construct and operate a massive aircraft maintenance facility at the new Denver international airport. It is in the best interests of the state, as well as of United, that the proposed legislation be drawn in a fashion most likely to survive a constitutional challenge. The possibility that a court may strike down this legislation as unconstitutional would cloud the future of the proposed maintenance facility and endanger the potential benefit to Colorado's economy.
Many of the constitutional provisions at issue in this matter arose at a time when citizens were greatly concerned about the undue influence of private corporations, most notably railroads, upon government. The Colorado Constitution's framers attempted to halt the abuse of public debt to further speculative business ventures. Accordingly, our state constitution contains express language banning donations (art. XI, § 2) and appropriations to private corporations (art. V, § 34). Undoubtedly, the original intent of the drafters of the constitution was to preclude the state from using public funds to become a partner in private business ventures.
However, the Colorado Supreme Court has not applied the constitutional language literally for decades. Over the state's history, the court has construed these constitutional provisions to allow the General Assembly considerable flexibility to craft solutions for economic problems so long as any indirect benefits to private business are outweighed by the legislation's public purpose. The legislation must contain findings of a significant public purpose that is served by the proposed tax incentives, because the court will scrutinize that legislative determination and measure it against the considerable benefits accruing to United. It is very unlikely that a court would strike down the current proposal as either an unconstitutional donation or a special appropriation.
The proposed legislation would not violate the constitutional provisions relating to corporate taxation. However, serious constitutional questions would arise if the legislation purported to be irrepealable, or impaired the financial base of government.
The proposal would not deny equal protection nor be prohibited special legislation merely because it provides special tax incentives for United, so long as other corporations would also be eligible if they were to undertake a project of similar magnitude and benefits. The General Assembly has great latitude to set appropriate restrictions on the type of project or business that will qualify, such as minimum size limits, minimum numbers of new jobs created, and the nature of the industry eligible for these tax benefits. Although the courts have sometimes ruled that narrowly drawn statutes are unconstitutional special legislation, it appears that in this case the proposed incentives will be neither special legislation nor a denial of the equal protection of the laws, even if only United chooses to undertake a project to which those incentives apply.
The proposed legislation does raise some significant concerns with respect to the constitution's prohibition of irrevocable grants. Even if the proposed legislation does not constitute special legislation, it is constitutionally suspect to the extent it purports to grant irrevocable benefits to United or any class of taxpayer.
The proposed legislation also would grant the Governor undefined discretion to determine whether tax refunds will be granted to an otherwise eligible taxpayer, and in what amount. An open-ended delegation of an income tax power is unconstitutional, but it appears that this difficulty may be remedied through careful legislative drafting.
The most troubling aspect of this proposal from a constitutional perspective is the commitment by the General Assembly to make cash payments to United for the next 30 years. Art. XI, § 3 of the Colorado Constitution forbids the state from incurring a general obligation debt. The Colorado Supreme Court consistently has interpreted that provision to prohibit the General Assembly from pledging the revenues of future years to pay for today's legislative commitments, thereby tying the hands of future legislatures. Unlike the constitutional provisions relating to private appropriations and donations, the courts have never implied a public purpose exception to the prohibition against general obligation debt.
In my opinion, a legislative promise to make cash payments to United for a period of 30 years from any revenues available to the state is precisely the type of future obligation prohibited by art. XI, § 3. A distinction must be made between the cash payments contemplated by this legislative proposal and a credit against taxes which does not exceed the taxpayer's liability. In the latter case, a tax credit is simply a reduction in a tax liability that would otherwise be due the state and does not require a future legislature to make payments from revenues otherwise available for general purposes. To the extent that a tax credit does not exceed the tax liability, it does not amount to a debt of the state. Ordinarily, a future legislature cannot be barred from repealing such a tax credit. The proposal under consideration is significantly more burdensome because it would entitle United to a cash payment even if United has no tax liability. If the only source of such payments is future revenues otherwise available for the state's expenditures, then that proposal would violate the Colorado Constitution.
It may be possible to structure an arrangement where the payment of incentives to United in the future would not be considered a general obligation debt. For example, any obligation could be made subject to annual legislative appropriation or restricted to payment from an earmarked special fund. However, the key element of any such constitutional arrangement is that the General Assembly must remain free to change its mind and repeal future subsidies. So long as there is no legally enforceable commitment requiring future legislatures to spend revenues otherwise available for the general purposes of state government, there is no violation of the General Obligation Debt Clause.
II. PROPOSED LEGISLATION
I have been provided by Legislative Legal Services with a working draft of proposed legislation to be considered at the special session and I have considered the contents of that draft in reaching my opinion. A brief summary of its relevant provisions will assist in understanding my conclusions.
Under the proposed legislation, the Governor would be authorized to negotiate and enter into contracts with eligible taxpayers, not limited to United, to provide for state income tax credits or refunds if eligible taxpayers create substantial new employment at an "anchor facility" and "ancillary facilities." An "anchor facility" is defined as either: (1) a new business facility located in a metropolitan area enterprise zone which employs at least 3000 new employees at an average salary of at least $45,000; or (2) a new business facility in an enterprise zone located outside of a standard metropolitan statistical district employing at least 1500 new employees at an average salary of at least $45,000. An "ancillary facility" means any facility of an eligible taxpayer located in the state other than an anchor facility.
The legislation contains specific legislative findings on the vital need to provide incentives to employers who commit to build anchor facilities and ancillary facilities resulting in "substantial and long-term expansion of new employment" in Colorado. The legislature finds that the public purpose served by these incentives "outweighs all other individual interests."
If the Governor decides to enter into a contract with an eligible taxpayer based upon certain legislative guidelines, the taxpayer may receive, for up to 30 future tax years, an annual credit or refund against income taxes of up to $2000 for each new employee at anchor and ancillary facilities. If the eligible taxpayer's total credits under this provision exceed its annual income taxes, it may be entitled to a "refund" to be paid from the reserve for refunds created by Colo. Rev. Stat. § 39-22-622.
The proposed bill further provides that neither the state nor its agencies, officers and employees shall take action that shall "limit, alter, restrict or impair the rights or remedies of any eligible taxpayer for any claim arising from an agreement against the state or any other person," and the state consents to be sued to enforce the contract terms. Once an agreement is entered with an eligible taxpayer, the bill precludes subsequent legislation that would invalidate or otherwise affect the contract. The draft also sets out various restrictions on the availability and calculation of the tax credits and refunds.
III. HISTORICAL BACKGROUND
The key constitutional provisions considered in this opinion were incorporated in the original Colorado Constitution, a document drafted in the historical context of the rapid westward expansion of the 19th Century. In that epoch, the construction of transportation systems was perhaps even more significant to rapid economic growth than are such projects today. The drafters were well aware that in the first half of the 19th Century many state and local governments had provided governmental assistance to private railroad ventures only to see them fail, leaving the public entities holding worthless stock or obligated for large debts. Several states were forced to repudiate such obligations. Colorado was only one of many states which adopted constitutional provisions intended to restrict public indebtedness and to bar governmental participation in private business ventures.See generally Comment, State ConstitutionalProvisions Prohibiting the Loaning of Credit to PrivateEnterprise — A Suggested Analysis, 41 U. Colo. L. Rev. 135, 136-138 (1969) ("Comment, StateConstitutional Provisions").
Even prior to the constitutional convention, taxpayers in the most populous counties of Colorado had approved bond issues and assumed railroad securities, resulting in heavy mortgages for county governments. Public indebtedness and a suspicion of ambitious private corporations were major concerns at the constitutional convention, leading to the strongly worded constitutional prohibitions that remain today. Id. at 138. As late as 1914, the Colorado Supreme Court recognized that the drafters' intent was to create protections in the state's fundamental law to prevent the abuse of the public treasury to aid private railroad companies. Noting that many other states had adopted similar prohibitions, the court concluded that those found in art. XI, §§ 1 and 2 of the Colorado Constitution (prohibiting the pledging of the state's credit and private donations) were:
 broader in scope, and more specific in the matter of restriction, than any similar constitutional provision considered or brought to our attention.
Lord v. City and County of Denver, 58 Colo. 1, 16,143 P. 284, 288 (1914). Each of the relevant provisions will be discussed below.
IV. ANTI-DONATION CLAUSE
The Colorado Constitution, art. XI, § 2, provides, in pertinent part:
 Neither the state, nor any county, city, town, township, or school district shall make any donation or grant to, or in aid of, or become a subscriber to, or shareholder in any corporation or company or a joint owner with any person, company, or corporation, public or private . . . .
During the first 40 years of statehood, the Colorado Supreme Court found occasions to strictly interpret these provisions to invalidate efforts by governments to aid private businesses. Constitutional violations were found without regard to the underlying public benefits of the particular project. InColorado Central R.R. Co. v. Lea, 5 Colo. 192 (1879), the court found that art. XI, § 2 was violated by an attempt by Boulder County to purchase private railroad stock, then donate the stock back to the company in return for an extension of its railway line. The court, which included three participants at the state constitutional convention, reasoned that it did not matter whether the railroad would be a "great benefit" to Boulder County. What mattered was the intention of the drafters of the constitution to prohibit "all public aid to railroad companies."5 Colo. at 196-197. Chief Justice Elbert stated for the court that if the existence of a public benefit was enough to remove this transaction from the constitutional prohibition, "then the prohibition is utterly nugatory and valueless, as such consideration would exist in every probable case." Id.
In 1914, a proposal of the City of Denver to join with a private railroad company to construct the Moffat Tunnel was held to be an impermissible partnership between the public and private sectors, in violation of art. XI, §§ 1 and 2. Lord v.City and County of Denver, supra. The intent of the framers, said the court, was "to utterly prohibit the mingling of the public moneys with those of private persons, either directly or indirectly, or in any manner whatsoever."443 P. at 288. Eight years later the court upheld legislation that created a special improvement district to build the Moffat Tunnel and distinguished the Lord case on the ground that the special improvement district was not involved in a partnership with the private railroad company. Milheim v. Moffat TunnelImprovement District, 72 Colo. 268, 211 P. 649 (1922),aff'd, 262 U.S. 710 (1923).
Modern cases have vitiated the impact of the strict interpretation adopted in early judicial decisions. For example, in 1948 the court upheld the validity of a contract between Denver, a railroad company, and an investment company to exchange property and cash to obtain a right-of-way for the Valley Highway. No donation problem was found where there was essentially a cash transaction, with no pledge of credit and no private partnership created. Chitwood v. City and County ofDenver, 119 Colo. 165, 201 P.2d 605 (1948).
Judicial inquiry now focuses upon whether the public entity received some benefit in return for the benefit conferred on the private corporation and whether a "public purpose" exists to justify the legislation. See, e.g.,McNichols v. City and County of Denver, 131 Colo. 246,280 P.2d 1096 (1955) (city contribution to police pension fund for distribution to pensioners was not a donation where there was a public purpose served by pensions for public employees);Allardice v. Adams County, 173 Colo. 133, 476 P.2d 982
(1970) (issuance of county revenue bonds to finance purchase of agricultural feed plant by private company did not violate art. XI, § 2 where enabling legislation stated a public purpose to relieve unemployment and aid the economy); DURA v.Byrne, 618 P.2d 1374 (Colo. 1980) (since there is a strong public purpose served by urban renewal projects, the fact that private interests are indirectly benefited does not result in an unconstitutional donation); see alsoMcNichols v. City and County of Denver,101 Colo. 316, 74 P.2d 99 (1937).
Two recent decisions deserve discussion because they illustrate the lengths to which the court will go to avoid finding a violation of the Anti-Donation Clause. Witcher v.Canon City, 716 P.2d 445 (Colo. 1986), raised the issue of the validity of the re-negotiation of a long-term lease between Canon City and the private operator of the city-owned Royal Gorge Bridge. In order to repay the operator for costs of the modernization of the bridge, the city agreed to reduce its percentage of tolls collected by the operator. The city further agreed to permit imposition of a new fee on concessions, with the large part going to the operator until the costs of improvements were recovered. The court found no co-mingling of private and public funds, stating that the city had "simply altered its contractual entitlement to current rents in exchange for the future benefits it will receive from the modernization."716 P.2d at 455. The court also found no violation because:
 The authorization of improvements to the Royal Gorge Bridge clearly serves the valid public purpose of improving and extending the life of a valuable source of municipal revenue and enhancing a major attraction that brings visitors to the City.
Id.
Opponents of the project argued that even if the public purpose doctrine applied, it required that the city receive adequate consideration. The court disagreed, saying that even if the city could have compelled its private lessee to modernize the bridge at the lessee's own cost, no constitutional violation resulted merely because the city chose to compensate its lessee in order to induce the operator to extend the useful life of the bridge. 716 P.2d at 455, 456 (citing Lyman v. Town of BowMar, 188 Colo. 216, 533 P.2d 1129 (1975)).
City of Aurora v. Public Util. Comm'n, 785 P.2d 1280
(Colo. 1990), is the most recent case to discuss the Anti-Donation Clause. The court there described the purpose of art. XI, § 2 as
 [t]o prohibit a municipality from transferring public funds to a private company or corporation without receiving any consideration in return. The term "donation" obviously means a gift — that is, a voluntary transfer of property to another without consideration.
785 P.2d at 1288. The court then applied the public purpose exception, stating as follows:
 [W]e draw substantial support for our decision from the public purpose doctrine. Our prior cases have held that article XI, section 2 of the Colorado Constitution does not prohibit a municipality from conferring a monetary benefit on a private company in consideration of the company's undertaking a project, even though the company might have been required to undertake the project without such benefit, as long as the expenditure by the municipality furthers a valid public purpose.
785 P.2d at 1289 (emphasis added).
In sum, judicial construction of the Anti-Donation Clause permits legislation granting a benefit to a private company that furthers a public purpose. The General Assembly will be required to find that the proposed United legislation provides such a public benefit, which is discussed in greater detail below.
V. PRIVATE APPROPRIATION CLAUSE
The Colorado Constitution, art. V, § 34, states as follows:
 No appropriation shall be made for charitable, industrial, educational or benevolent purposes to any person, corporation or community not under the absolute control of the state . . . .
Read literally, the express language of this provision would preclude the General Assembly from virtually any attempt to provide state funds to a private individual or corporation. However, in only one case — decided almost a century ago — has the Colorado Supreme Court actually invalidated a legislative scheme because it provided funding to private persons or organizations in violation of art. V, § 34. In reRelief Bills, 21 Colo. 62, 39 P. 1089 (1895). The question for the modern court is not whether certain legislation incidentally benefits a private recipient, but whether the appropriation also serves a public purpose. Defining public purpose in the broadest of terms, modern judicial decisions have upheld legislation which benefited private persons or organizations in significant ways.
Article V, § 34 was held to be violated by legislation which made an appropriation of state funds for the purchase of seed and grain by destitute farmers living in Colorado counties suffering a severe drought. In re Relief Bills,supra. Interestingly, the court concluded that the constitutional issue must be decided without regard to the admitted hardship resulting in individual cases. But that same year, the court found no violation of that constitutional provision when the General Assembly appropriated funds to repair damage caused to a private building during construction of a state canal. In re Substitute for Senate Bill No.83, 21 Colo. 69, 39 P. 1088 (1895) (payment held to be compensation for a public taking rather than a gift or payment for operating expenses). The very next year, the court found no violation of art. V, § 34 in legislation that required counties to pay private institutions for the care of drunkards committed by court order. In re House, 23 Colo. 87,46 P. 117 (1896) (holding that the prohibition applied only to state funds, not to a state requirement that a county pay with local funds).
In a 1940 case involving a challenge to payment of judicial pensions from the state's general fund, the court announced that art. V, § 34 was not violated where payments to private persons were made for a "public purpose." Bedford v.White, 106 Colo. 439, 106 P.2d 469 (1940) (judicial pensions were granted primarily for the benefit of the state rather than the benefit of the individual recipient). This judicial exception was enunciated most recently in the following language:
 [T]he critical consideration under Article V, section 34 is whether the appropriation serves a public purpose, even though the recipient may be a private citizen who is incidentally benefited by the payment.
Americans United for Separation of Church and State Fund,Inc. v. State, 648 P.2d 1072, 1085 (Colo. 1982) (no unconstitutional private appropriation involved in a program providing for grants of state funds to in-state students attending private colleges located in Colorado). That decision explicitly recognized that the rule stated in the 1895 case ofIn re Relief Bills, supra, had changed with Bedford v. White, supra.See 648 P.2d at 1086 n. 11. Seealso In re Interrogatories, 193 Colo. 298,566 P.2d 350 (1977). The fact that this legislative proposal would confer a private benefit on United would not result in a violation of art. V, § 34 so long as there was a sufficient public purpose.
VI. "PUBLIC PURPOSE" DOCTRINE
For all intents and purposes the public purpose doctrine is the exception that has swallowed the constitutional rules enunciated in art. V, § 34 and art. XI, §§ 1 and 2. We have found no Colorado cases in the last 50 years in which the court has asked whether a valid public purpose justifies a legislative proposal, without deciding that question in the affirmative.
With the decisions in Witcher v. Canon City,716 P.2d 445 (Colo. 1986), and City of Aurora v. Public Util.Comm'n, 785 P.2d 1280 (Colo. 1990), the pendulum of judicial reasoning has swung to the furthest extreme from the anti-donation rule announced in 1879 in Colorado Central R.R.Co. v. Lea, supra. As the early members of the court predicted in that case, virtually any public aid to a private corporation is lawful so long as there is a public purpose stated in the legislation.
Historically, courts inquired into the public purpose underlying legislation in order to determine whether the minimum requirements of due process had been met. Public funds raised by taxation may not be spent for private purposes without violating the 14th Amendment to the United States Constitution, the courts reasoned. See, e.g., McNichols v. Cityand County of Denver, supra;Milheim v. Moffat Tunnel Improvement Dist.,supra; Comment, State ConstitutionalProvisions, supra. As discussed above in this opinion, the public purpose doctrine has quite a different role today. By finding a sufficient public purpose, the court has excused what might otherwise have been a violation of the state constitution, even though public funds were used to benefit private recipients.
The term "public purpose" is "not susceptible of precise definition and ultimately depends upon the facts and circumstances of the case." City of Aurora v.Public Util. Comm'n, supra, at 1290. General statements of legislative purpose will be considered in the court's determination. The court will give "reverent weight" to legislative intent to promote a public purpose and will take into account the modern trend toward liberal construction of that term. Allardice v. Adams County, 173 Colo. 133,476 P.2d 982, 989-990 (1970).
There are numerous Colorado judicial decisions asserting that economic development and increased employment are legitimate public purposes for legislative projects. A brief catalog of approved public purposes would include: pensions for retired Supreme Court judges (Bedford v. White,supra); relief from extreme unemployment, maintaining a stable economy and promoting agricultural products (Allardice v. Adams County, supra); enhancement of a tourist attraction (Witcher v. CanonCity, supra); developing urban renewal projects that increase the valuation of private property (DURA v.Byrne, supra); financing low income housing (In re Interrogatories, supra).
Despite this pattern of judicial deference to legislative findings of a public purpose, the court will not necessarily accept every legislative determination at face value. Discussing a similar public purpose determination under the eminent domain power, the Colorado Constitution provides: "[T]he question whether the contemplated use be really public shall be a judicial question, and determined as such without regard to any legislative assertion that the use is public." Colo. Const. art. II, § 15. The court has suggested in one recent case that it may be prepared to balance the relative benefits conferred by specific legislation on the private recipient and on the public to determine whether a public purpose is predominant, stating as follows:
 We do not mean to imply that because a public purpose may be presumed from the passage of a legislative enactment, any statutory appropriation would pass muster under Article V, Section 34. On the contrary, the legislation must evince a discrete and particularized public purpose which when measured against the proscription of Article V, Section 34, preponderates over any individual interests incidentally served by the statutory program.
Americans United for Separation of Church and State Fund,Inc. v. State, supra, at 1086 (emphasis added).
This legislative proposal to provide massive tax incentives to United stretches the limits of the public purpose doctrine beyond the circumstances of any of the cases decided previously, most of which involved some type of direct benefit to the public entity. The closest analogy occurs in Allardice v. AdamsCounty, supra, where the county chose to issue revenue bonds benefiting one private enterprise over others. There the broad public purpose of reducing unemployment and improving the economy was found sufficient, even in the absence of any direct benefit to the county.
In examining the public purpose doctrine, a distinction must be made between the two primary approaches to constitutional interpretation. A strict construction approach adheres closely to the language of the Constitution, and generally attempts to implement the Constitution based on the original intent of its framers. A judicial activist approach utilizes current practical realities to interpret the constitution in a manner consistent with modern needs and understandings. I am personally committed to the strict construction view, that a constitution is the overriding document that creates a structure of fairness and objectivity. By preserving clear rules of the game, the constitution prevents favoritism and whim, while the amending process allows the rules to change as modern society changes.
The proposed legislation provides aid to a private corporation that would not pass muster under the Colorado Constitution as originally intended. As a strict constructionist interpreting the Constitution on a clean slate, I would find the United tax incentives unconstitutional as violating the Anti-Donation and Private Appropriation Clauses. The obvious similarity between the framers' desire to prevent entanglement with railroad projects, and the currently proposed airline project, is persuasive. Nevertheless, in advising the General Assembly, I cannot ignore the vast divergence between the original intent of the Constitution and modern judicial interpretation. Given the historical trends, public purposes such as those set forth in the proposed legislation will almost certainly pass judicial muster.
VII. CORPORATE TAXATION
The Colorado Constitution has two provisions specifically directed at the taxation of private corporations. Article X, § 9 states that:
 The power to tax corporations and corporate property, real and personal, shall never be relinquished or suspended.
Article X, § 10, states:
 All corporations in this state, or doing business therein, shall be subject to taxation for state, county, school, municipal and other purposes, on the real and personal property owned or used by them within the territorial limits of the authority levying the tax.
The intent of these provisions is to "proscribe the legislative power to impair the financial base of government operations." Allardice v. Adams County,supra, at 995; DURA v. Byrne,supra, at 1386-1387. They generally require that corporations pay their just and fair proportion of taxes.Imperial Fire Ins. Co. v. Board of County Commr's,51 Colo. 456, 118 P. 970 (1911) (invalidating exemption of insurance companies from taxation).
Furthermore, art. X, § 9 prevents the state from suspending or relinquishing its power to impose taxes in the future. American Smelting Ref. Co. v. People exrel. Lindsley, 34 Colo. 240, 82 P. 531 (1905),rev'd on other grounds, 204 U.S. 103 (1906). In Union Pac. R.R. Co. v. Heckers, 181 Colo. 374,509 P.2d 1255 (1973), the Union Pacific Railroad and the Colorado Department of Revenue had entered into a memorandum of understanding in 1944 determining the amount of taxable income allocable to Colorado. Twenty-five years later, the Department of Revenue promulgated regulations abrogating this memorandum. In upholding this action, the Colorado Supreme Court stated:
 The memorandum created no contractual responsibility and did not and could not provide for permanency of operation. Colo. Const. Art. II, § 11 and Art. X, § 9. When the Director gave the notice provided by the administrative code of a hearing on rules which would abrogate all understandings, such as that of the memorandum, Union Pacific could not constitutionally or in law ask for more.
Id. at 1260.
While it does not appear that the proposed legislation would run afoul of the constitutional provisions regarding corporate taxation, serious constitutional questions would arise if the legislation purported to be irrepealable, or impaired the financial base of government.
VIII. SPECIAL LEGISLATION CLAUSE
The Colorado Constitution, art. V, § 25, provides, in pertinent part:
 The general assembly shall not pass local or special laws . . . granting to any corporation, association or individual any special or exclusive privilege, immunity or franchise whatever. In all other cases, where a general law can be made applicable no special law shall be enacted.
This provision was at least in part specifically directed at attempts to grant special privileges or "franchises" to railroad companies, often resulting in enormous losses to the public fisc.
In many ways, the Special Legislation Clause is a specialized sort of equal protection guarantee. "[V]iolation of the Fourteenth Amendment of the United States Constitution amounts to special legislation prohibited by Article V, Section25 of the Colorado Constitution." People v. Sprengel,176 Colo. 277, 279, 490 P.2d 65, 67 (1971) (citing Dunbar v.Hoffman, 171 Colo. 481, 468 P.2d 742 (1970)).
A. Standard of Review.
 In evaluating challenges under the Special Legislation Clause:
 It is elementary that . . . the party asserting the unconstitutionality of the statute must clearly demonstrate such a defect; and, that "if we can conceive of any reasonable state of facts bearing a reasonable relation to the purpose behind [the statute] which could justify the classification made," we must uphold the statute.
Id. (quoting Dunbar v. Hoffman,468 P.2d at 744) (emphasis in original). See alsoKinterknecht v. Indus. Comm'n, 175 Colo. 60, 66,485 P.2d 721, 724 (1971) ("if any state of facts reasonably can be conceived which would sustain the classification, there is a presumption of the existence of that state of facts, unless rebutted by common knowledge or judicial notice of other legitimate proof.")
Under the Equal Protection Clause of the 14th Amendment, the power of a state to classify for purposes of taxation is "of wide range and flexibility." Louisville Gas Co. v. Coleman,227 U.S. 32, 37 (1928). A state may tax different types of taxpayers differently, despite the fact that they compete.Tax Comm'rs v. Jackson, 283 U.S. 527 (1931) (tax based upon number of stores maintained). See alsoGreat Atlantic Pacific Tea Co. v. Grosjean,301 U.S. 412 (1937) (license tax based upon number of stores both within and without the state); Ohio Tax Cases, 232 U.S. 576
(1914) (higher gross receipts tax for railroads than for other utilities).
"The Equal Protection Clause does not require that `all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made.'" Archer Daniels Midland Co. v.State, 690 P.2d 177, 188 (Colo. 1984) (quoting Baxstromv. Herold, 383 U.S. 107 (1966)); Loup-MillerConstruction Co. v. Denver, 676 P.2d 1170 (Colo. 1984); People v. Chavez, 629 P.2d 1040 (Colo. 1984)). In Archer Daniels Midland, the Colorado Supreme Court upheld a five cent per gallon sales tax reduction on certain gasohol. The reduction applied only to gasohol containing at least ten percent alcohol derived from agricultural and forest products, and produced from no more than three million gallons of alcohol annually by facilities having a design production capacity of 17 million gallons or less annually. Despite the clear object and intent of the General Assembly to preserve the tax break "for every current and prospective fuel-grade alcohol producer in Colorado, while continuing to avoid subsidization of the overwhelming majority of fuel-grade alcohol production capacity outside [the] state," 690 P.2d at 191 (Lohr, J., dissenting) (emphasis in original), the court found no equal protection violation. 690 P.2d at 188.
Classifications must be made upon a real and substantial difference, Southern Ry. Co. v. Green Co., 216 U.S. 400,417 (1910), and the difference need not be great or conspicuous, Keeney v. New York, 222 U.S. 525, 538
(1931), but there must be no discrimination in favor of one as against another of the same class. Giozza v. Tierman,148 U.S. 657, 662 (1893). In addition, discriminations of an unusual character are scrutinized with special care.Louisville Gas Co., 227 U.S. at 37.
In addition, the classification must be "based upon a substantial difference which reasonably relates to the purpose of the statute." People v. Sprengel,490 P.2d at 67. In Sprengel, the court struck down a statute prohibiting motels but not hotels from posting signs advertising prices, unless accommodations were available at the rates quoted at all times. The avowed purpose of the statute was to protect travelers from "bait advertising." Finding the differences between motels and hotels to be negligible and in any event bearing no relationship to the purpose of the statute, the court found a violation of both the Equal Protection Clause and the Special Legislation Clause. Id.
Under the Special Legislation Clause, the Colorado Supreme Court has generally shown deference to legislative classifications, holding:
 Whether a general law cannot be made applicable, so as to permit thereby a special law, is a discretionary determination by the legislature, which is not reviewable by the Court unless a palpable abuse of discretion is shown.
Morgan County Junior College Dist. v. Jolly, 168 Colo. 466,470, 452 P.2d 34, 36 (1969), appealdismissed, 396 U.S. 24 (1969), overrulingin part, Brown v. City of Denver,7 Colo. 305, 3 P. 455 (1884), and Rhinehart v.Denver Rio Grande R.R. Co., 61 Colo. 369, 158 P. 149
(1916).
More recently, in Schafer v. Aspen SkiingCorporation, 742 F.2d 580 (10th Cir. 1984) the Colorado Ski Safety Act of 1979 was attacked as a grant of special privileges or immunities. The Act shortened the statute of limitations for negligence claims against ski resort operators from six years to three. The court of appeals did not address the question of special legislation, but noted that "[t]he ski industry makes a substantial contribution, directly or indirectly, to the Colorado economy. The state has a legitimate interest in its well-being and economic vitality. See the declaration of legislative intent . . . ." 742 F.2d at 584.
B. Inconsistent Interpretation.
Historically, a lack of consistency of interpretation prevails. There are cases on both sides of this issue. The courts have invalidated restrictions relating to the sale of certain merchandise on Sundays, Denver v.Bach, 26 Colo. 530, 58 P. 1089 (1899), and Sunday business closings, Allen v. City of Colorado Springs, 101 Colo. 498,75 P.2d 141 (1937); Dunbar v. Hoffman,supra, at 745 (1970) (barber shops). Butsee Rosenbaum v. City and County ofDenver, 102 Colo. 530, 81 P.2d 760 (1938) (court upheld similar laws prohibiting the Sunday sale of motor vehicles).
1. Cases Finding Special Legislation
In Champlin Ref. Co. v. Cruse, 115 Colo. 329,173 P.2d 213 (1946), at issue was a motor fuel excise tax statute granting, to distributors first receiving such fuel in-state, a 2% tax deduction for losses in transit and unloading by evaporation and spillage. The deduction was limited to only fuel received from refineries, and not on that received from bulk stations. The court ruled that the scheme "discriminate[d] in favor of a company powerful and wealthy enough to own and operate a refinery, and against the company not possessed of one," in violation of art. V, § 25, and the Equal Protection Clause of the 14th Amendment. Id. See alsoMountain States Tel. Tel. Co. v. Animas MosquitoControl Dist., 152 Colo. 73, 380 P.2d 560 (1963); Halev. City County of Denver, 159 Colo. 341, 411 P.2d 332
(1966).
Perhaps the most notable special legislation discussion is the Colorado Supreme Court's rather direct analysis in In reSenate Bill 95, 146 Colo. 233, 361 P.2d 350 (1961). There, the General Assembly had passed the "Glendale Bill," which provided, in pertinent part:
 Whenever any town existing under the general laws of this state contains less than six hundred and forty acres in area and shall have been surrounded for a period of not less than five years by a city or city and county, the territory included within such surrounded town shall become a part of the surrounding city or city and county . . . .
361 P.2d at 351.
As drawn, only one town could come within the legislation's terms, either presently or prospectively. The court's reasoning in ruling that the bill violated art. V, § 25, is significant:
 Senate Bill No. 95 has had a stormy and very public legislative history. As judges we may not close our eyes to facts which as men we conclusively know to be true, which we would have to do if we pretended to be unaware of the fact that this legislation was known to every member of the legislature and to every other interested person as "The Glendale Bill." We would be blind to stark reality indeed if we assumed the possibility of any other geographical areas in Colorado to which it would apply . . . . To say that this court cannot take judicial notice of these matters of public record and common knowledge is not unrealistic.
361 P.2d at 353.
As if to ensure there was no doubt, the court reiterated:
 Senate Bill No. 95 was unquestionably conceived, cut, tailored and amended to accomplish a particular purpose with reference to a particular area . . . . The thin veneer of language used to "get around" the constitutional prohibition, and to give to the measure of a mask of general application, falls from the face of the bill when considered in light of the common knowledge of which we may take judicial notice.
361 P.2d at 354.
The court concluded by noting:
 The limitations upon the power entrusted to those in positions of authority cannot be brushed aside as having no application to projects or enterprises considered by those in official positions, as desirable or necessary to serve a special and local purpose. We need but to go to the landmark case of Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60 where we find the following:
 "To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained? The distinction between a government with limited and unlimited powers is abolished, if those limits do not confine the persons on whom they are imposed."
Id.
2. Cases Upholding Legislation.
The difficulty in discerning a clear rule in this area is underscored by a series of other cases which have upheld a number of apparently similar types of distinctions. Bloomer v.Board of County Comm'rs of Arapahoe County,799 P.2d 942 (Colo. 1990) (county v. non-county roads); Cityof Littleton v. Board of County Comm'rs of ArapahoeCounty, 787 P.2d 158 (Colo. 1990) (special legislation concerning location of new judicial complex necessary to address specific circumstances); McCarty v. Goldstein,151 Colo. 154, 376 P.2d 691 (1962) (two- year statute of limitation applying to some health care providers but not others);Curtiss v. GSC Corp. of Colorado, 774 P.2d 873
(Colo. 1989) (statutory employer provisions of Workers' Compensation Act) DURA v. Byrne, 618 P.2d 1374 (Colo. 1980) (statute governing issuance of tax allocation bonds for urban renewal purposes was general law); Winkler v. ColoradoDep't of Health, 193 Colo. 170, 564 P.2d 107 (1977) (regulations which prohibited importation of pets for resale from states with less stringent licensing laws and regulations for commercial pet dealers, but which did not apply to breeders and those importing pets for personal use). In addition, distinctions based upon the size of the operation regulated are permissible. People v. Maxwell, 162 Colo. 495,427 P.2d 310 (1967) (statute requiring only subdivision developers with 20 or more sites to register with Real Estate Commission).
C. Ancillary Facilities.
A question arises whether an ancillary facility may constitutionally be taxed differently than a similar facility simply because the parent company operates a separate anchor facility. The proposed legislation distinguishes between "anchor" and "ancillary" facilities. The anchor facilities must be new, located in an enterprise zone, and employ a specified number of people at a high average salary. Ancillary facilities are any other locations operated by the eligible employer.
Like those at anchor facilities, new employees at ancillary facilities may be the objects of refundable tax credits for their employer. Thus, so long as an employer meets the requirements for establishing an anchor facility, refunds are available for all new employees of that company. Ancillary facility employees are eligible whatever their salary level, whether they work in a new facility or an existing one, and whether their workplace is located within or outside an enterprise zone.
United is expected to apply the ancillary facility tax credit to reservation operators, pilots, flight attendants, and other employees. Thus, the pilots and flight attendants working for one airline will be treated differently than those working for another. Over the term of the proposed legislation, a flight attendant working for United could create a $60,000 disparity in comparison with an identically employed flight attendant working for another airline. Identical "objects" of taxation would be treated differently because of the employer's ownership of an anchor facility.
The General Assembly has authority to classify objects of taxation under art. X, § 3. It may treat similar objects differently, so long as there is a reasonable basis for distinguishing between the groups. American Mobile HomeAss'n v. Dolan, 191 Colo. 433, 553 P.2d 758 (1976). The question is whether the classification "operates equally and uniformly upon all persons and corporations in similar circumstances." Ames v. People ex rel.Temple, 26 Colo. 23, 56 P. 656 (1899). The fairness of a taxpayer's allocable share of the total tax burden can only be meaningfully evaluated by comparison with the share of others similarly situated. Allegheny Pittsburgh Coal Co.v. Webster County, 488 U.S. 336, 346 (1989); Ochsv. Town of Hot Sulphur Springs, 158 Colo. 456,407 P.2d 678 (1967). Thus the courts will examine whether a sufficient rationale exists for similar facilities to be treated differently.
The proposed legislation in this case does provide some rationale for treating United ancillary employees differently from similar employees. Ancillary facility employees are justified as a separate category because of the benefits from attracting all the employees of an eligible employer. The construction of an anchor facility is expected to provide additional employment in other locations. Special tax treatment for employees at an ancillary facility may assist in encouraging job formation.
Furthermore, identical objects of taxation may be taxed differently based on different classes of taxpayers. For example, property owned by corporations may be taxed at a different rate than property held by individuals.Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356
(1973). Given the minimum rationality review applied to equal protection concerns in the tax area, it is very probable that the tax benefits for ancillary employees would be upheld.
D. Conclusion
If there is an overriding trend in the cases, it is towards a looser construction of the Special Legislation Clause. This is nowhere more evident than in People ex rel. Dunbar v. GilpinInv. Co., 177 Colo. 132, 493 P.2d 359 (1972). In that case, the court considered a challenge to a statute requiring the covering or fencing of "all excavations endangering the life of man or beast," but limited to mining property only. In so doing the court did not follow, but did not overrule In re Eight-HourBill, 21 Colo. 29, 39 P. 328 (1895), which held that "the General Assembly cannot impose labor restrictions on the mining industry which were not imposed upon other employers." Summarily concluding "[t]hat case is clearly distinguishable from the instant situation," without further explanation the court determined the statute did not amount to special legislation.Gilpin Inv., 493 P.2d at 361.
Cases such as Gilpin Inv. suggest that older cases in this area, while remaining ostensibly intact, may be limited to their facts, and may not be susceptible to broader application. Therefore, the General Assembly must be considered to have broad discretion in creating distinctions relating to the proposed agreement, although some care must be taken to avoid drawing classifications too narrowly. In the absence of a "substantial difference" between United and any parties not permitted to reap similar benefits, a legislative classification in this regard would be constitutionally suspect.
VIII. IRREVOCABLE GRANT CLAUSE
Art. II, § 11 of the Colorado Constitution provides, in pertinent part:
 No . . . law . . . making any irrevocable grant of special privileges, franchises or immunities, shall be passed by the general assembly.
There has not been extensive court interpretation regarding this particular provision. In City and County of Denver v.Stenger, 277 F. 865 (8th Cir. 1922), a contract by which Denver conceded its right to regulate street railroad fares was found to violate the Irrevocable Grant Clause. It does not appear, however, that under the proposed legislation the General Assembly would be giving up any rights to regulate any activities occurring within the "enterprise zones" that would be receiving tax credits.
Nonetheless, there do appear to be some facets of the proposal which could make it constitutionally suspect. In several respects, the proposed legislation indicates the irrevocable nature of the commitment to United, even if expected public benefits fail to materialize. The stated objective is to encourage expansion of employment opportunities. The legislation sets a goal in numbers — 3000 employees with an average salary of $45,000 if in a Standard Metropolitan Statistical Area (SMSA) and 1500 employees if not in an SMSA. The legislation also evinces an intent for the benefits to accrue to the agreeing parties for 30 years. However, the legislation as written only requires the hiring of 3000 new employees. It is unclear as to whether 3000 must remain employed throughout the entire 30 years. There is a provision which calls for reduction in benefits to the company if it fails to "perform its obligations under the agreement." Although this language may be intended to resolve this problem, the General Assembly should seek a more clear expression of its intent.
Furthermore, the required number of employees is not required to be reached until 10 years after the agreement is entered, suggesting United may be able to reap all the benefits prior to the 10 year cut-off date. In addition, it is not altogether certain what result is intended should United employ 1000 for nine years, receiving full benefits, in the ninth year reach 3000, and then declare bankruptcy. Clearly such questions are a cause of concern.
There is a potential problem with the legislation being an "irrevocable" grant of privilege, if the statute were construed to only require 3000 employees to be hired without a clear basis for revoking the tax credits if the conditions do not remain met. In Town of Estes Park v. Mills, 100 Colo. 94,65 P.2d 1086 (1937), the town had granted the right to use the sewage system, without additional cost, to the plaintiff. The plaintiff having paid the amount called for in the contract, the court decided the town could not subsequently change the terms of the agreement. A possible distinction is that in Mills
the plaintiff had a one-time obligation which he fully performed. A continuing obligation, with no clear right to revoke the agreement in the event of failure to perform, would appear to be much more dubious.
The cases seem to differentiate between an impermissible "law" which grants privileges, and contracts which are merely an exercise of government's proprietary powers. In Perl-MackEnterp. Co. v. City County of Denver, 194 Colo. 4,568 P.2d 468 (1977), the court ruled that a business contract, not being a "law," does not implicate the prohibitions of art. II, § 11. While there are no court interpretations which directly govern this situation, any statute purporting to irrevocably bind future legislatures must be deemed constitutionally suspect.
IX. DELEGATION OF TAXING POWER
The proposed legislation authorizes the Governor to negotiate and enter into an agreement with United to implement the tax refund program. The legislation lists specific factors to be considered by the Governor in deciding whether to enter into an agreement, and it describes various provisions to be included in the agreement. There are two key aspects of the Governor's authority that are not detailed in the proposed bill: (1) The agreement "may provide that the taxpayer shall obtain" a tax credit or refund, thus apparently vesting the Governor with discretion to deny a tax advantage, even if the taxpayer complied with all other requirements; and (2) the amount of a tax credit or refund is to be determined by the agreement, but "not to exceed two thousand dollars for each new employee," thereby authorizing the Governor and taxpayer to negotiate a tax credit within the specified range. As to both of these points, the legislation does not provide the Governor any guidance for exercising his discretion.
This open-ended delegation of the power to impose or refund an income tax would violate Article III of the Colorado Constitution, which is a strong and explicit provision concerning the separation of powers. Art. X, § 17 gives the General Assembly the power to levy an income tax, but also states that that power cannot be delegated.
Delegation of the power to levy an income tax was challenged in City County of Denver v. Sweet,138 Colo. 41, 329 P.2d 441 (1958). The court held unanimously inSweet that the adoption of art. X, § 17 gave the General Assembly the exclusive power to levy graduated or proportional income taxes. Additionally, the court stated "We also point out that the General Assembly due to Article X, § 17's precise wording now has no power to delegate this particular taxing power to any other body. Only the people by constitutional amendment can make this change if they deem it necessary." 329 P.2d at 447.
Sweet was challenged 11 years later, in City County of Denver v. Duffy Storage Moving Co.,168 Colo. 91, 450 P.2d 339, appeal dismissed, 396 U.S. 2
(1969). Again, unanimously, the court upheld Sweet, holding that the rule in Sweet had become an integral part of Colorado law. Any changes deemed necessary should come from the people by their exercise of the power to initiate amendments to the constitution. The court clearly stated thatSweet would not and should not be overruled.
Given this strong precedent, the General Assembly cannot delegate overly broad tax-related discretion to the Executive Branch. While the proposed legislation contains a serious constitutional infirmity, it appears to be one that can be remedied relatively easily by more explicit draftsmanship. A gubernatorial agreement may still play a role in fixing the details of the situation, but the General Assembly must retain the ultimate power to impose a tax or grant a refund.
X. GENERAL OBLIGATION DEBT CLAUSE
The Colorado Constitution, art. XI, § 3, provides, in pertinent part:
The state shall not contract any debt by loan in any form . . . .
In over 100 years since the adoption of the Colorado Constitution, this section consistently has been interpreted in numerous cases to prohibit the state from incurring a general obligation debt. The public purpose exception applied by the courts to the restrictions set out in art. V, § 34, and art. XI, § 2, has never been extended to the prohibition against general obligation debt. One of the strongest statements of the policy underlying this prohibition appears in the case of Inre Senate Resolution No. 2, 94 Colo. 101, 31 P.2d 325
(1933), in the following language:
 The purpose of the people in adopting the section involved is clear, i.e. to keep the state substantially on a cash basis, to prohibit the pledge of future fixed revenues, to forbid the contracting of debts which must be paid therefrom, and to make certain that one General Assembly shall not paralyze the next by devouring the available resources of both.
31 P.2d at 332.
Some indications of a debt prohibited by the constitution have been described as follows:
 that the obligation pledges revenues of future years, that it requires use of revenues from a tax otherwise available for general purposes, that it is a legally enforceable obligation against the state in future years, or that the appropriation by future legislatures of monies in payment of the obligation is nondiscretionary.
Glennon Heights, Inc. v. Central Bank Trust, 658 P.2d 872,878-79 (Colo. 1983).
Recognizing that the meaning of the term debt may vary, the court has upheld certain government obligations. Illustrative examples are listed below:
 (a) revenues in the highway users trust fund may be pledged to repay federal advances for construction, supervision and maintenance of public highways, because those earmarked funds are not available for general government purposes, Johnson v. McDonald, 97 Colo. 324, 49 P.2d 1017 (1935). See also Watrous v. Golden Chamber of Commerce, 121 Colo. 521, 218 P.2d 498 (1950);
 (b) a project which produces all the revenue necessary to discharge the revenue bonds issued to create the project, without recourse to the general revenues of the public body, does not create debt, Lewis v. State Bd. of Agric., 138 Colo. 540, 335 P.2d 546 (1959); City of Trinidad v. Haxby, 136 Colo. 168, 315 P.2d 204 (1957);
 (c) where an urban renewal improvement project will result in an increased valuation for affected property, the incremental value to be raised by an existing property tax may be pledged without violating the constitution, DURA v. Byrne, 618 P.2d 1374
(Colo. 1980); Allardice v. Adams County, 173 Colo. 133, 476 P.2d 982 (1970).
 (d) lease-purchase obligations subject to nonrenewal on an annual basis, where the state's obligation to make lease payments are subject to annual appropriation, do not constitute debt. Glennon Heights, Inc. v. Central Bank Trust, 658 P.2d 872 (Colo. 1983); Gude v. City of Lakewood, 636 P.2d 691
(Colo. 1981).
Key to these exceptions to the requirements of art. XI, § 3, is the absence of any legally enforceable obligation by the state which would commit future revenues that are otherwise available for general purposes. See In reInterrogatories, 193 Colo. 298, 304, 566 P.2d 350, 355
(1977).
With these constitutional principles in mind, this analysis must focus on precisely what commitments the General Assembly would make to United as part of a tax incentive package. Your letter states that it is probable that tax credits promised to United would exceed the airline's tax liabilities in future fiscal years, resulting in cash payments by the state to United for the excess. If the current General Assembly were to make a legally enforceable promise to make cash payments for 30 years, that commitment would be unconstitutional and void. The only source of payments to keep that future commitment would be future general revenues otherwise available for the general purposes of the state, revenues which a current legislature constitutionally may not pledge. See, e.g., In reSenate Resolution No. 2, supra. (special fund doctrine is not applicable where legislation does not pledge anticipated revenues from an improvement created by the act or new sources of revenue, but only revenue which previously was available for general state expenditures);Gude v. City of Lakewood, supra, at 696-697.
A distinction must be drawn between the cash payments contemplated in this tax incentive proposal and a tax credit which merely reduces a taxpayer's liability. The former actually amounts to a form of grant which is paid by shifting tax revenues received from other less fortunate taxpayers. The latter tax credit confers a benefit, but does not require a commitment of future revenues to make the payment.
By statute, the prompt payment of tax refunds is assured through the use of a reserve in an amount determined periodically by the state controller "from taxes collected" under the income tax laws. See Colo. Rev. Stat. § 39-22-622(1) (1982). It has been suggested that the cash payments to United would be paid out of this refund reserve and therefore would never be available for expenditure for the general purposes of the state. But this argument overlooks the fact that tax refunds are intended to return overpayments of estimated income tax previously made and which the state is not entitled to retain.See Colo. Rev. Stat. § 39-22-605(7) (1982). No one contends that the cash tax incentives to be paid to United under this legislative proposal represent a refund of overpaid taxes. If the controller can simply designate a portion of future revenues by administrative fiat and set it aside for payments of commitments made by the current General Assembly, then the constitutional limitation on debt no longer would have any significance. See In re Senate Resolution No.2, supra.
Possible avenues may exist to fund future payments to United. The approaches discussed below have not been tested by litigation, but each reflects the reasoning of Colorado Supreme Court decisions which have upheld analogous government obligations.
One approach would be to make all commitments to United subject to annual appropriation by the General Assembly. If all cash payments to United in future fiscal years were made subject to annual legislative appropriation, there would be no constitutional violation. Future legislatures could evaluate the costs and benefits of these incentives annually without having their hands tied, since "[t]he public can never be overburdened by that which it is under no obligation to discharge . . . ."Gude v. City of Lakewood, supra, at 700.
Alternatively, the General Assembly might establish a designated special fund from which these incentives could be paid. Johnson v. McDonald, supra. Into that special fund would be paid incremental revenues received by the state as a result of United's construction and operation of additional facilities and which would not have been generated in the absence of the new facility. SeeDURA v. Byrne, supra. Hayes v.State Property Bldg. Comm'n, 731 S.W.2d 797 (Ky. 1987) (financial incentive plan, attacked on several state constitutional grounds closely analogous to Colorado prohibitions, upheld on a narrow four to three vote).
If the General Assembly established a special fund of earmarked revenues as the sole source from which future commitments to United would be paid, the obligation might survive constitutional scrutiny. Such a fund might be created with all future revenues identified as to be derived as a direct result of the construction and operation of the United aircraft maintenance facility and of all new jobs created as a consequence. A legislative formula might be developed to identify those revenues which represent an increment over and above any revenues that the state would otherwise have received in the absence of the facility. All incremental tax revenues could be pledged to the special fund for payment of the obligation to United but the state's obligation would be limited to payment from that fund. If there were no incremental revenues, then United would have no recourse to other state revenues.
If the proponents of tax incentives for United are correct concerning the benefits to the state, it should be possible to develop a legislative formula to identify the incremental tax benefits which will flow as a direct benefit of this project. So long as payments to United are restricted to moneys that accrue to this special fund, and do not constitute a general obligation payable from other revenues of the state, then the constitutional prohibition would be avoided. See, e.g.,DURA v. Byrne, supra; Watrousv. Golden Chamber of Commerce, supra.
SUMMARY
To summarize, the proposal submitted to me which forms the basis for this formal opinion is constitutionally infirm. It is most flawed as it relates to art. XI, § 3, the General Obligation Debt Clause. Serious questions are also raised by several other specific provisions, each of which has been fully discussed above. I have attempted to propose remedies wherever possible. However, if the proposal were to become law as submitted, I believe that it would be unconstitutional.
Sincerely,
 GALE A. NORTON Attorney General
CONSTITUTIONAL LAW PUBLIC DEBT
HB 91-1005 HB 91-1009
Colo. Const. Art. XI, § 1 and § 3
Colo. Const. Art. V, § 34
Colo. Const. Art. V, § 25
Legislature
Promise to pay tax incentives to United Airlines for 30 years would be an unconstitutional debt unless limited to payment from a special fund or subject to annual appropriation.